# EXHIBIT 2

925-831-9029                                                    emerickfinch@emerickfinch.com

Page 1

```
 1                 UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF CALIFORNIA

 3                          ---o0o---

 4   MATTHEW PETERSON, SADIE FLODING,
     COLIN STRUB, CARSON BRENDA, JODY
 5   BARRY, TEISCHA BENSON, LYNNETTA
     KLAM, and LORI DAVIES,                    CERTIFIED
 6                                             TRANSCRIPT
                  Plaintiff(s),
 7       vs.                              Case No.
                                          1:22-cv-00701 JLT-CDB
 8
     THOMSON INTERNATIONAL,
 9   INCORPORATED, a California corporation;
     DOES 1-10, INCLUSIVE; and ROE
10   ENTITIES 1-10, INCLUSIVE,

11                Defendant(s).
     _____/
12

13

14
                       REMOTE DEPOSITION OF
15
                           JODY BARRY
16
                  Thursday, December 21, 2023
17

18

19   REPORTED BY:

20   DEBRA J. SKAGGS, CSR 7857

21

22              EMERICK AND FINCH
            Certified Shorthand Reporters
23         18 Crow Canyon Court, Suite 125
             San Ramon, California 94583
24           emerickfinch@emerickfinch.com
            (925) 831-9029  (800) 331-9029
25
```

925-831-9029                                            emerickfinch@emerickfinch.com

Page 4

1           BE IT REMEMBERED that, pursuant to Notice, and

2      on Thursday, December 21, 2023, commencing at the hour of

3      10:01 A.M., thereof; in their respective locations via

4      Zoom, as noticed by the attorneys for the Defendants,

5      GREENAN, PEFFER, SALLANDER & LALLY LLP, 2000 Crow Canyon

6      Place, Suite 380, San Ramon, California, was before me,

7      DEBRA J. SKAGGS, CSR No. 7857, a Certified Shorthand

8      Reporter, State of California, remotely appeared.

9                           JODY BARRY,

10     produced as a witness herein, in the above-entitled

11     action, who, being by me first remotely duly sworn or

12     having affirmed, was thereupon examined and testified as

13     a witness in said action.

14                            --o0o--

15                      (Witness sworn in.)

16                            --o0o--

17                          PROCEEDINGS

18           THE REPORTER:  Thank you.

19           Ms. Barry, will you state the city and state

20     where you're located taking your deposition.

21           THE WITNESS:  Gresham, Oregon.

22           THE REPORTER:  Will the attorneys state their

23     appearances and who they represent for the record,

24     please.

25           ATTORNEY LIEN:  Lindsay Lien on behalf of

925-831-9029                                    emerickfinch@emerickfinch.com

Page 16

```
 1   A.          I don't know.
 2   Q.          What do you know about Defendant Thomson?
 3   A.          I know nothing.
 4   Q.          What are you suing Thomson for?
 5               ATTORNEY LIEN:  Objection; foundation.
 6               Go ahead, Jody.
 7               THE WITNESS:  Okay.
 8               Well, all my medical and pain and suffering.
 9               ATTORNEY CHEN:  Q.  When you say you are
10   suing Thomson for medical, could you please describe
11   what happened to you?
12   A.          Well, first of all, I came down with a high
13   fever.  I was very chilled.  And my husband took my, you
14   know, temperature, and it was 103.5.  I started --
15   started with throwing up and it also coming out the
16   other end.  So diarrhea, throwing up, and just major
17   cramping.
18   Q.          When did you first experience those symptoms?
19   A.          It was mid-July.  I couldn't tell you the
20   exact date.
21   Q.          Which year?
22   A.          It was 2020, I believe.
23   Q.          What did you do when you had those symptoms?
24   A.          Ran to the bathroom, and that was it.  And lay
25   in bed.  I slept and -- like I said, the only time I got
```

1  up was to go to the bathroom.

2  **Q.        What else did you do?**

3  A.        Nothing.  I slept -- just slept and went to
4  the bathroom.

5  **Q.        You just testified you are seeking medicals in**
6  **this case --**

7  A.        Okay.  Well, let me clarify.

8              About two days into my sickness, all I did was
9  sleep.  My husband told me -- or drug [sic] me to the
10 urgent care to see if I had COVID-19, and I was -- it
11 was determined that I did not have it.  And then my
12 husband, two days later, because the symptoms were
13 getting worse, I went to urgent care again.  And then
14 they said they couldn't take care of that, and they sent
15 me to emergency, which my husband took me promptly to
16 the emergency room.

17 **Q.        Did you say your husband "dragged" you or**
18 **"drugged" you to urgent care?**

19 A.        No -- let's just say I didn't want to go, but
20 he insisted that I go.  So because he insisted --
21 obviously I was too sick to make my own decisions at
22 that time because I was so sick.

23 **Q.        Did he drug you to go to urgent care?**

24 A.        Well, you're saying drug me, but he -- he took
25 me -- he insisted that I go.  Not dragged me or drug me,

Case 1:22-cv-00701-JLT-CDB   Document 93-2   Filed 11/18/24   Page 6 of 16
925-831-9029                                       emerickfinch@emerickfinch.com
Page 20

```
 1   Q.      Did you stay overnight at the hospital?
 2   A.      No.
 3   Q.      Were you released the same day?
 4   A.      Yes.
 5   Q.      Did your symptoms get better after you were
 6   released from the hospital?
 7   A.      No, not for a day or two later.
 8   Q.      What happened a day or two later?
 9   A.      I was able to get up, wash myself, eat a
10   little.  But that was basically it.
11   Q.      How long did your symptoms last?
12   A.      Well, I -- you mean -- it took me weeks to get
13   better.  But the -- the worst days were maybe one
14   through seven.
15   Q.      Was your fever gone after your release from
16   the hospital?
17   A.      My fever continued only for five days, I
18   believe.  Maybe six.  I can't recall.
19   Q.      What about your chills?
20   A.      It lasted about the same time: about five or
21   six days.
22   Q.      What about throwing up?
23   A.      What was that?
24   Q.      What about -- you said you threw up.  What
25   about vomiting?
```

1  A.         Oh, I -- yes.  It was -- vomiting for a
2  couple -- two days, three days, I believe it was.  But
3  mostly diarrhea.
4  **Q.         When did your diarrhea symptoms resolve?**
5  A.         Weeks.
6  **Q.         Could you give me a timeline of the weeks?**
7  **Was it three weeks? four weeks?**
8  A.         I would say five weeks.
9  **Q.         What about cramping?**
10 A.         Oh, that lasted about the same time.  Every
11 time I had to go to the bathroom, I had cramping.  But
12 the worst part would be about five weeks as well.
13 **Q.         Did your cramping symptoms resolve after five**
14 **weeks?**
15 A.         Yes.  Yes.
16 **Q.         Now, let's talk about your tests.**
17 **           Did any of the results of your tests come back**
18 **when you were in the hospital?**
19 A.         I believe they came back two days later with
20 the Newport strain.
21 **Q.         Newport strain for what?**
22 A.         I guess salmonella.
23 **Q.         From which tests did they get the result for a**
24 **Newport strain?**
25            ATTORNEY LIEN:  Objection; foundation.

925-831-9029                                            emerickfinch@emerickfinch.com

Page 23

```
 1   Q.    Who is your primary doctor?
 2   A.    Dr. Paul Podett.
 3   Q.    Could you please spell his last name?
 4   A.    P-o-d-e-t-t.
 5   Q.    Which medical practice is Dr. Podett with?
 6   A.    He's a primary -- or just a general doctor.
 7   What do you -- I don't know what you call it.  A general
 8   doctor of everything.
 9   Q.    Is he affiliated with any particular medical
10   provider?
11   A.    I believe he's with Legacy.
12   Q.    What kind of a medical provider is Legacy?
13   A.    I don't know.
14   Q.    Is he affiliated with any other medical
15   providers?
16   A.    I don't know.
17   Q.    When did you see Dr. Podett?
18   A.    I think it was in August.  Mid-August,
19   something like that.
20   Q.    2020?
21   A.    Yes.
22   Q.    Were your symptoms resolved when you saw
23   Dr. Podett?
24   A.    No.  I still had diarrhea and some cramping.
25   Q.    What kind of medical treatment did Dr. Podett
```

```
 1   provide to you?
 2   A.      It was consultation, basically; and how to, I
 3   guess, comfort myself, whether -- you know, telling me
 4   to go see a specialist, or just take Tylenol or
 5   whatever.
 6   Q.      Did you take Tylenol?
 7   A.      Oh, yes.
 8   Q.      After your visit to Dr. Podett?
 9   A.      Yes.
10   Q.      Was your fever resolved at the time when you
11   saw Dr. Podett?
12   A.      Yes, it has.
13   Q.      What did --
14   A.      It did.
15   Q.      -- what did you take Tylenol for?
16   A.      Just -- still in a little bit of pain.
17   Q.      For your cramping?
18   A.      Only when I had to go to the bathroom.  And I
19   still had diarrhea after I saw Dr. Podett.
20   Q.      How long did you take Tylenol?
21   A.      Five, six weeks.  Something like that.
22   Q.      Now, you just testified that your symptoms
23   resolved in five weeks after the onset.
24   A.      Yes.
25   Q.      And you saw Dr. Podett about a month or two
```

1   weeks after your --

2   A.      No, it was longer than that.  I think I saw
3   him five or six weeks after, I believe.  Maybe it was a
4   month later; four weeks.  I don't recall exactly.
5   Q.      But by that time your symptoms were almost
6   resolved except for cramping and diarrhea; right?
7   A.      That is correct.  Five or six weeks, yes.
8   Q.      So when did you start to take Tylenol?
9   A.      On the onset.  When I started having a fever
10  of 103.5, I took Tylenol.  That's the only thing that
11  would help the pain but also reduce the fever.
12  Q.      So you took Tylenol from the onset of your
13  symptoms for five to six weeks; is that correct?
14  A.      That is correct.
15  Q.      And not from your time when you saw the
16  doctor, Dr. Podett.
17  A.      No, he --
18  Q.      The first time you took Tylenol was when you
19  had --
20  A.      When I first -- when I first got sick, I
21  started with Tylenol.  And then it continued until I saw
22  Dr. Podett, and I continued it a little bit after
23  because the cramping and the diarrhea was still present
24  but not as bad.
25  Q.      Could you describe your cramping when you saw

1  Dr. Podett?

2  A.     Well, it was all in the abdomen, but
3  especially in the -- in the intestines.  In that area.
4  The lower -- lower stomach.

5  Q.     Isn't it true that your cramping was not
6  significant when you saw Dr. Podett?

7  A.     Not as bad.  But yes, it was still present.

8  Q.     What's the total amount of your medical bills?

9  A.     I don't know.

10 Q.     Have the bills been paid?

11 A.     Yes.

12 Q.     Did you have health insurance --

13 A.     Yes.

14 Q.     -- in 2020?

15 A.     Yes.

16 Q.     Do you know the salmonella outbreak strain in
17 2020?

18 A.     I didn't know, no.

19 Q.     Do you know the whole genome sequencing of the
20 2020 salmonella outbreak?

21        ATTORNEY LIEN:  Objection; foundation.

22        ATTORNEY CHEN:  Q.  You should answer my
23 question.

24 A.     No.

25 Q.     Do you know the whole genome sequencing of

925-831-9029                                              emerickfinch@emerickfinch.com

Page 27

```
 1   your salmonella stool sample?
 2   A.      No.
 3           ATTORNEY LIEN:  Objection.
 4           ATTORNEY CHEN:  Q.  Does the whole genome
 5   sequencing of your salmonella stool sample match the
 6   whole genome sequencing of the 2020 salmonella
 7   outbreak?
 8           ATTORNEY LIEN:  Objection; foundation.
 9           THE WITNESS:  I don't know.
10           Sorry, Lindsay.  I didn't mean to talk over
11   you.
12           ATTORNEY LIEN:  Oh, you're -- yeah, just wait
13   if I object, but.
14           THE WITNESS:  Okay.
15           ATTORNEY CHEN:  Q.  Are you seeking
16   emotional distress damages in this lawsuit?
17   A.      No.  Just pain and suffering.
18   Q.      Are you seeking psychological care damages in
19   this lawsuit?
20   A.      No.
21   Q.      When you say pain and suffering, can you
22   describe your damages?
23           ATTORNEY LIEN:  Objection; foundation.
24           Go ahead, Jody.
25           THE WITNESS:  Well, acute pain with cramping;
```

```
 1  the diarrhea; the throwing up; the fever; the lack of
 2  spending time with my family; doing whatever pleasures
 3  myself, whether it was outside in the garden or cooking.
 4  I could do nothing.
 5            ATTORNEY CHEN:  Q.  Did your husband get
 6  sick in July 2020?
 7  A.        No.
 8  Q.        What about your son Jake?
 9  A.        No.
10  Q.        What about your son Vincent?
11  A.        No.
12  Q.        Are you seeking damages for anxiety in this
13  lawsuit?
14  A.        No.
15            ATTORNEY LIEN:  Objection; foundation.
16            ATTORNEY CHEN:  Q.  Yeah, please wait till
17  your counsel is finished so the court reporter can
18  take down both of your words.
19            THE WITNESS:  Lindsay?
20            ATTORNEY LIEN:  Yeah, answer the question.
21            THE WITNESS:  No.
22            ATTORNEY CHEN:  Q.  Are you seeking any
23  damages for disfigurement?
24  A.        No.
25  Q.        Are you seeking any damages for physical
```

Page 31

 1   Q.        Was there blood in the diarrhea?
 2   A.        Not in the beginning, no.
 3   Q.        When did you have blood in the diarrhea?
 4   A.        It was around day five.
 5   Q.        When did you stop having blood in your
 6   diarrhea?
 7   A.        I don't recall.
 8   Q.        You eventually stopped to have blood in your
 9   diarrhea?
10   A.        Yes.  Eventually.
11   Q.        And after your salmonella symptoms resolved,
12   you did not have blood in your diarrhea anymore; right?
13   A.        That's correct.
14   Q.        Now, I would like you to tell me the food you
15   ate in the last seven days before you got sick in
16   July 2020.
17   A.        Well, I'm kind of a chef, so I cook
18   everything.  So there is chicken, beef, vegetables.  I
19   really enjoy Mexican food, so I make a lot of tacos and
20   things like that.  Eat salsas.  Salads.
21   Q.        Now, let's start with the date you got sick.
22             What did you eat on the date you got sick?
23   A.        Well, the day that I got sick, we had Mexican
24   food.  And we stopped and got my -- one of my favorite
25   salsas at a little tienda, and went home and we had our

Page 37

 1  Q.      When did your symptoms start?
 2  A.      They started -- the same evening I -- the same
 3  evening I got sick. So -- but, you know, I figured it
 4  was nothing and I continued to eat it.
 5  Q.      What were your first symptoms?
 6  A.      My first symptoms started around -- I think
 7  the 10th, and I got real ill with chills that evening.
 8  Q.      Did you have diarrhea?
 9  A.      After the chills and I couldn't get warm, I
10  got very nauseated, and I threw up. And the cramping
11  was very bad, and I had to rush to the bathroom.
12  Q.      How long did the nausea symptoms last?
13  A.      About five days.
14  Q.      As you sit here today, have your nausea
15  symptoms resolved?
16  A.      Yes.
17  Q.      How do you know the salsa was made in-house in
18  the grocery store?
19  A.      I do not know.
20  Q.      So when you testified earlier, you said that
21  the salsa was homemade. That was just a guess; right?
22  A.      Well, it doesn't have a label on it.
23  Q.      You mean no label on the plastic container?
24  A.      Just the price tag.
25  Q.      My first question is no label on the plastic

925-831-9029                                          emerickfinch@emerickfinch.com

Page 95

```
 1                      EMERICK & FINCH
                  Certified Shorthand Reporters
 2              18 Crow Canyon Court, Suite 125
                  San Ramon, California 94583
 3                       (925) 831-9029


 4   Date:  January 11, 2024


 5
     Jody Barry
 6
     Re:  MATTHEW PETERSON vs 1:22- THOMSON INTERNATIONAL
 7   Date Taken:  Thursday, December 21, 2023


 8
     Dear Jody Barry,
 9
              Your deposition in the above matter is now
10   available at this office.  You may wish to discuss with
     your attorney whether he or she requires that it be
11   read, corrected, if necessary, and signed before it is
     filed with the court, if so ordered.
12
              Since the original deposition may not be
13   released from our custody, if you wish to sign it,
     please appear at this office, 18 Crow Canyon Court,
14   Suite 125, San Ramon, California, within the next 30
     days on any weekday between the hours of 9:00 a.m. and
15   4:00 p.m.  You must bring this letter with you.

16            As an alternative, you may wish to read your
     attorney's copy of the deposition and notify this office
17   by letter of any changes you wish to be made.

18

19                      Very Sincerely,

20                      EMERICK & FINCH

21
                        _____
22                      Debra J. Skaggs

23

24   cc:  All Counsel

25
```